# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| EDWARD J. ELEAZER and MAYA E. ELEAZER, husband and wife and their marital community | ) ) ) ) | DIVISION ONE |
| | ) | No. 70513-0-I |
| Petitioners, | ) ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BUSH HOUSE, LLC, a Washington limited liability company, its successor and assigns; SNOHOMISH HEALTH DISTRICT, a municipal corporation of the State of Washington; and LOYAL MARY NORDSTROM, an individual, | ) ) ) ) ) ) ) | |
| | ) | |
| | ) | |
| Respondents. | ) ) | FILED: August 25, 2014 |

DWYER, J. — "It is unthinkable that courts should undertake the writing of contracts for sellers and buyers who have failed or refused, rightly or wrongly, to come to terms between themselves." Haire v. Patterson, 63 Wn.2d 282, 287, 386 P.2d 953 (1963). In this case, the trial court—failing to heed this directive—transformed a general promise to grant a septic easement into a detailed easement agreement, replete with terms that were never agreed upon by the contracting parties. In so doing, the trial court erred.

Edward and Maya Eleazer entered into a residential real estate purchase and sale agreement (REPSA) with Loyal Mary Nordstrom to purchase a single-

family house. Included in the REPSA was a two sentence addendum in which the Eleazers promised to grant an easement to the owner of the Bush House property—an adjoining property, then owned by Nordstrom, on which was located a hotel and restaurant. Although an easement was never granted, the real estate transaction closed: the Eleazers tendered the purchase price to Nordstrom and Nordstrom conveyed the house and real property to them.

Several years later, both Nordstrom and the subsequent purchasers of the Bush House property—Bush House, LLC (BHLLC)—contacted the Eleazers, seeking conveyance of a septic easement. No agreement was reached. The Eleazers filed a quiet title action against BHLLC and the Snohomish Health District (SHD). Nordstrom intervened as a defendant. Nordstrom then filed a counterclaim, seeking specific performance of the Eleazers' obligations pursuant to the addendum. The trial court ruled that the Eleazers had breached their promise to grant a septic easement and, subsequently, imposed detailed easement terms upon which the parties had never agreed.

On discretionary review, we are asked whether the addendum to the REPSA was an unenforceable agreement to agree and whether it merged into the statutory warranty deed. Although the easement provision did not merge into the deed, we hold that the trial court erred in the manner in which it imposed specific performance. Accordingly, we reverse and remand.

I

Prior to 2007, Nordstrom owned adjoining properties in Index, Washington. On one property was a single-family house. On the other property

was a hotel and restaurant known as the Bush House. In February 2007, the Eleazers offered to buy the single-family house (hereinafter Eleazer property) from Nordstrom and the parties entered into a REPSA. When they purchased the property, the Eleazers knew that an on-site septic system (OSS) serving the Bush House included a drain field that was located in their front yard. At the insistence of Nordstrom's listing agent, the Eleazers included a Form 34 addendum to the REPSA, which stated: "Buyer agrees to grant access for maintenance of OSS to Bush House B&B. Access to be granted in the form of a recorded easement *agreeable to both parties*." (Emphasis added.)

Thereafter, Nordstrom conveyed title to the subject property to the Eleazers by statutory warranty deed. The deed made no mention of the Form 34 addendum to the REPSA, and the Eleazers claimed that Nordstrom did not contact them about an easement until October 2010—over three years after the closing date.[1] The deed did contain an express acknowledgment that the title was marketable with specific exceptions, including easements not materially affecting the value of or unduly interfering with the grantees' reasonable use of the property.

> GRANTOR ACKNOWLEDGES THAT TITLE TO THE PROPERTY IS MARKETABLE AT THE TIME OF THIS CONVEYANCE. THE FOLLOWING SHALL NOT CAUSE THE TITLE TO BE UNMARKETABLE. RIGHTS, RESERVATIONS, COVENANTS, CONDITIONS, AND RESTRICTIONS, PRESENTLY OF RECORD AND GENERAL TO THE AREA, *EASEMENTS AND*

---

[1] BHLLC contacted the Eleazers in 2010 and demanded that they grant an easement to BHLLC by October 8, 2010. Subsequently, on October 21, Nordstrom wrote a letter to the Eleazers in which she enclosed a prepared easement agreement and requested that the Eleazers satisfy the promise made within the Form 34 addendum.

*ENCROACHMENTS, NOT MATERIALLY AFFECTING THE VALUE OF OR UNDULY INTERFERING WITH GRANTEE'S REASONABLE USE OF THE PROPERTY*, AND RESERVED OIL AND/OR MINING RIGHTS.

(Emphasis added.)

In December 2011, Nordstrom sold the Bush House property to BHLLC.

In February 2012, the SHD denied the Eleazers' application requesting permission to repair their septic system by connecting it to the OSS drain field—located in the Eleazers' front yard—that serves the Bush House property. In its letter denying the Eleazers' application, the SHD explained that Nordstrom had filed a declaration of restrictive covenants in May 1993, which might have created "some sort of cloud on the title" of the Eleazer property or granted dominant control over the OSS and portions of the Eleazer property to the owner of the Bush House property. The SHD declined to issue a septic repair permit to the Eleazers because it was "not readily clear" who had the ownership control of the OSS and the immediate area.

Back in March 1993, the SHD had approved the OSS serving the Bush House property with certain conditions, including the following: "All components of onsite sewage facility on separate tax lots from the Bush House Restaurant must be tied to Bushhouse [sic] via recorded easements." To comply with the SHD's letter requirement, Nordstrom recorded with the county auditor a copy of the SHD letter of conditional approval and a declaration of restrictive covenants, which covered both the Eleazer property and the Bush House property. The restrictive covenants stated that they were to "run with said land" and bind the

owners of the properties and all of their future grantees and successors. The restrictive covenants also provided that they were enforceable by a municipal, county, or quasi-judicial agency against the owners of the property or their successors who violate or attempt to violate any of the covenants.

In April 2012, the Eleazers filed a quiet title action in Snohomish County Superior Court against BHLLC and the SHD. The Eleazers claimed that when they purchased their property in 2007, they were not aware of the existence of either the restrictive covenants or the SHD's March 1993 letter to Nordstrom, although both were recorded. The Eleazers requested an order declaring the restrictive covenants and the March 1993 letter invalid and requiring the county auditor to strike them. Nordstrom intervened in the action, and the Eleazers amended their complaint to allege that Nordstrom had breached the statutory warranty deed and to seek damages from her. BHLLC and Nordstrom filed counterclaims against the Eleazers, including a claim for breach of the promise contained in the Form 34 addendum.

In May 2013, on cross motions for partial summary judgment, the trial court dismissed the Eleazers' claims, rejected their request for dismissal of the counterclaims of BHLLC and Nordstrom, and ruled that the "Eleazers are in breach of the Form 34 promise to grant an OSS easement to the Bush House." The trial court ordered the Eleazers to grant and record an OSS easement in a form acceptable to the SHD.

> If Eleazers fail or refuse to grant and record an OSS easement in a form acceptable to SHD within a reasonable time, but no later than July 1, 2013, this Court will appoint a Special Master under CR 70

and RCW 6.28.010 to grant and record such an easement, upon motion to approve language.

The Eleazers sought discretionary review of this order.[2]

On June 27, 2013, upon the three defendants' joint motion to implement the May 23 order, the trial court appointed a special master to sign and record an easement on or after July 1, 2013. The easement to be signed and recorded was attached to the court's order and set forth in detail the legal descriptions of the easement. It was eight pages long and addressed such issues as the grant, access to the Eleazers' property and the septic system, maintenance of the system, obligations to repair the system, risk of loss resulting from the Eleazers' negligence, enforcement of rights granted in the easement, securing the grantee's rights and economic losses as a lien against the Eleazers' real property, and attorney fee entitlements.

In resisting the trial court's orders, the Eleazers stated that when they received the survey of the easement, they were "stunned, totally taken by surprise," because they "had no idea" an easement for the Bush House OSS could be "that huge," adding "[i]t even goes under our house."

On September 11, 2013, the trial court granted the Eleazers' motion for discretionary review certification pursuant to RAP 2.3(b)(4).

> The Court certifies pursuant to RAP 2.3(b)(4) that its May 23, 2013 partial-summary-judgment order involves controlling questions of law between the parties as to which there is substantial ground for

---

[2] The Eleazers argue that the trial court erred in enforcing the restrictive covenants. Although the order signed by the trial court, as proposed, included conclusions as to the SHD's right to enforce the restrictive covenants and the Eleazers' alleged breach of the restrictive covenants, the trial judge excised these provisions before affixing his signature.

a difference of opinion and that immediate review of the order may materially advance the ultimate determination of the litigation and provide for judicial efficiency.

Our commissioner granted discretionary review of two issues related to the enforceability of the provision contained in the Form 34 addendum: (1) whether the agreement is an unenforceable agreement to agree, and (2) whether it merged into the statutory warranty deed upon closing.[3, 4]

II

The Eleazers contend that the trial court erred by granting specific performance and imposing easement terms. This is so, they aver, because the provision contained in the Form 34 addendum was merely an agreement to agree. Although the Eleazers are correct that the trial court erred, the court's error does not entitle them to receive more than they bargained for in the REPSA. By closing the sale, both the Eleazers and Nordstrom accepted performance of the contract as to all other material terms. The promise contained in the Form 34 addendum was one that subjected both buyer and seller to a duty of good faith and fair dealing. However, if the parties could not reach a good faith agreement, each was entitled to refrain from closing. Thus, under the facts of this case, the trial court erred both by granting specific

---

[3] Although our commissioner concluded that other issues raised by the parties did not meet the stringent criteria for discretionary review, she allowed that, "the parties may brief any of those issues to the panel considering the appeal, and the panel may address such issues." We choose not to do so.

[4] BHLLC appears to argue that discretionary review was improperly granted. Although RAP 17.7 permits objection to a ruling of a commissioner, objection may only be made by a motion to modify the ruling directed to the judges of the court not later than 30 days after the commissioner's ruling is filed. BHLLC did not avail itself of this procedure and may not circumvent the strictures of RAP 17.7 by challenging the commissioner's ruling in its merits brief.

performance of terms never agreed to by the contracting parties and by granting that performance in favor of two parties to the litigation who were not a party to the contract itself.

"An appellate court reviews a partial summary judgment order de novo and engages in the same inquiry as the trial court." Woo v. Fireman's Fund Ins. Co., 161 Wn.2d 43, 52, 164 P.3d 454 (2007). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

"[A] grant of easement must describe a specific subservient estate; that is an absolute." Berg v. Ting, 125 Wn.2d 544, 549, 886 P.2d 564 (1995). "[A]ny words which clearly show the intention to give an easement . . . are sufficient to effect that purpose, providing the language is sufficiently definite and certain in its terms." Beebe v. Swerda, 58 Wn. App. 375, 379, 793 P.2d 442 (1990).

On the other hand, "[a]greements to agree are unenforceable in Washington." Keystone Land & Dev. Co. v. Xerox Corp., 152 Wn.2d 171, 176, 94 P.3d 945 (2004). This is designed to "'avoid trapping parties in surprise contractual obligations.'" Keystone, 152 Wn.2d at 178 (quoting Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 497 (S.D.N.Y. 1987)). Therefore, "for a contract to form, the parties must objectively manifest their mutual assent" and "the terms assented to must be sufficiently definite." Keystone, 152 Wn.2d at 177-78.

"When specific performance is sought, rather than legal damages, a higher standard of proof must be met: 'clear and unequivocal' evidence that

'leaves no doubt as to the terms, character, and existence of the contract.'"

Kruse v. Hemp, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993) (quoting Powers v. Hastings, 93 Wn.2d 709, 717, 713, 612 P.2d 371 (1980)); see also RESTATEMENT (SECOND) OF CONTRACTS § 362 (1979).

> "For specific performance is demanded that degree of certainty and definiteness which leaves in the mind of the court no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is to compel to be done. The element of completeness denotes that the contract embraces all material terms; that of certainty denotes that each one of these terms is expressed in a sufficiently exact and definite manner."

Haire, 63 Wn.2d at 287 (quoting 49 Am. Jur. § 25, p. 38). "It is unthinkable that courts should undertake the writing of contracts for sellers and buyers who have failed or refused, rightly or wrongly, to come to terms between themselves." Haire, 63 Wn.2d at 287.

Before addressing the propriety of the trial court's order, we pause to clarify that, although our commissioner granted discretionary review of the question whether the provision contained in the Form 34 addendum was an agreement to agree, that is not the appropriate inquiry. The agreement to agree inquiry presupposes that no valid contract otherwise exists, which is not the case here given that the parties entered into a contract and performed nearly all of their obligations thereunder. Given the existence of a substantially-performed contract, the germane inquiry, and the one that we embark upon, is whether the provision contained in the Form 34 addendum was sufficiently certain and definite such that specific performance was an appropriate remedy. In addition,

and more specifically, we must determine which contractual obligation is an appropriate subject for a grant of specific performance.

With the scope of our inquiry delimited, we proceed to address the propriety of the trial court's order. The provision contained in the Form 34 addendum to the REPSA consists of two sentences: "Buyer agrees to grant access for maintenance of OSS to Bush House B&B. Access to be granted in the form of a recorded easement *agreeable to both parties*." (Emphasis added.) Neither the Eleazers nor Nordstrom dispute that this provision was a material term of the REPSA, and the record reveals that the provision has not been performed; that is, the parties to the REPSA have not agreed to the terms of an easement. Nevertheless, the trial court ordered the Eleazers to grant an easement to BHLLC—a nonparty to the REPSA—that was also agreeable to the SHD—also a nonparty to the REPSA—by July 1, 2013, and when the Eleazers failed to comply with this order, the trial court transformed the two sentence promise in the Form 34 addendum into a detailed eight page easement.[5]

In order to impose specific easement terms, it would have been first necessary for the trial court to be presented with clear and unequivocal evidence that left no doubt as to the specific terms agreed to by the Eleazers and Nordstrom. These terms would have needed to be sufficiently certain and definite such that no reasonable doubt was left in the mind of the trial judge as to what the parties intended and as to what terms should be imposed. The record,

_____

[5] Nordstrom, the only party who ever did, in fact, have a contractual relationship with the Eleazers, was conspicuously absent from the easement agreement imposed by the trial court.

however, contains no evidence offered to the trial court suggesting that the parties agreed to any specific easement terms. Tellingly, the trial court imposed specific terms of an easement only *after* it had determined that the Eleazers failed to comply with its order to record an easement agreeable to the SHD.

The easement imposed by the trial court contains a number of terms that were not mentioned in the REPSA. The imposition of these terms hinders the Eleazers' use and quiet enjoyment of their land, augments their exposure to financial risk, and decreases the resale value of their property. While the impropriety of the trial court's order does not stem directly from the harm done to the Eleazers' interests, the harm reflects the paramount importance of requiring certain and definite terms; in the absence of such terms, a trial court will inevitably—and inappropriately—assume an authorial role in enforcing the contract.

- *Time of access.* BHLLC is given a right of access in order to ensure the proper function, inspection, maintenance, and repair of the OSS between the hours of 8:00 a.m. and 5:00 p.m., Monday through Saturday. In the event of an emergency, however, BHLLC is entitled to access at any time. The liberal access granted to BHLLC precludes the Eleazers from enjoying the sense of repose attendant to residential property ownership and is likely to decrease the resale value of the property. More significantly, the specificity of these terms comes from the trial judge's mental processes, not from the REPSA.

- *The SHD access.* Not only is BHLLC given the right to access the easement, the SHD—or a regulatory body performing the same functions as the SHD—is given unlimited access, to the extent it is reasonable and necessary to carry out their regulatory responsibilities. The liberal access granted to SHD similarly precludes the Eleazers from enjoying the sense of repose attendant to residential property ownership and is likely to decrease the resale value of the property. More significantly, the specificity of these terms finds its genesis in the trial judge's thought processes, not in the REPSA.

- *Grantor negligence.* The Eleazers are held responsible for repairing any damage to the OSS occurring as a result of their own negligence. Because of the exposure to significant liability in the event that the Eleazers unintentionally damaged the commercial grade OSS that is underneath nearly their entire property, the Eleazers assume a financial risk that they did not agree to assume in the REPSA.

- *Grantor use restrictions.* The Eleazers are prohibited from using their property in any way that would encroach upon the easement area. Notably, they may not place water, power, or utility lines in the area; they may not plant any plants, bushes, or foliage on the surface of the area; they may not drive, park, or pave over the area; and, they may not build any structure over the area. These burdensome restrictions substantially interfere with the Eleazers' ability to use their land as they

desire and is likely to decrease the resale value of their property. More significantly, the specificity of these terms finds its genesis in the thought processes of the trial judge, not in the REPSA.

- *Runs with the land.* The easement runs with the land. Given the use restrictions, loss of quiet enjoyment, and increased financial risk, it is fair to conceive that—in light of the easement running with the land— the resale value of the Eleazers' property is likely to decrease. Again, this provision results from an evaluation made by the trial judge, not from a reading of the REPSA.

- *Disuse or abandonment.* The easement is not extinguished by disuse, abandonment, or transfer. This provision all but ensures that the only way the easement may be extinguished is by agreement. Again, this provision is not found in the REPSA.

- *Attorney fees.* If litigation arises under the easement, the prevailing party is entitled to an award of costs and attorney fees. The prospect that the Eleazers would be required to pay what could amount to the sizeable attorney fees of one or more commercial entities exposes them to significant financial risk, which could effectively preclude the Eleazers from even attempting to assert their rights, given the prospect of financial ruin were they not to prevail. Again, this provision was not agreed to by the Eleazers and Nordstrom.

As noted, the imposition of the above terms hinders the Eleazers' use and quiet enjoyment of their land, augments their exposure to financial risk, and decreases the resale value of their property. However, it is the omission of certain terms from the easement imposed by the trial court that could, in fact, prove even more destructive to the Eleazers' interests.

- *Grantee's negligence.* Although the easement holds the Eleazers responsible for their own negligence, no mention is made regarding the responsibility of BHLLC for its own negligence or intentional acts.

- *Act of God.* There is no provision identifying which party is responsible for damages caused by an Act of God. The effect of this omission is that the Eleazers could be partially or totally responsible for damages caused by a natural disaster, which would mean that they would be subsidizing the commercial ventures of BHLLC. The potential for damage done by BHLLC's sewage—that produced by a hotel and restaurant—could be far greater than the damage an ordinary single family homeowner might suffer from an Act of God.

- *Third parties.* There is no provision identifying which party is responsible for damages caused by the acts of third parties. Given that BHLLC is operating two commercial ventures, the presence of third parties is all but guaranteed. If the Eleazers were held responsible for damages caused by acts of third parties, they would be, in effect, subsidizing BHLLC's commercial ventures.

- *Apportionment of fault.* There is no provision explaining how, in the event that both the Eleazers and BHLLC contribute to the OSS being damaged, apportionment of fault should be made. Furthermore, there is no provision identifying which party should have the burden of proof if a dispute arises.

- *Grantee financial responsibility.* There is no provision explaining how the grantee is held financially responsible. For example, it would be reasonable for the grantor to require the grantee to carry insurance covering the Eleazers' potential losses. Nor is the financial responsibility of any tenant of BHLLC or successor to BHLLC addressed in any way.

- *Business tenant causes loss.* There is no provision holding BHLLC financially responsible if a business tenant causes damage to the OSS or to the Eleazers.

- *Transfer approval.* There is no provision indicating that the Eleazers would be required to approve the transfer of the Bush House property. The absence of such a term effectively leaves the Eleazers without protection against a financially insecure transferee, particularly given the dearth of any other terms that would protect the Eleazers from the associated risks of having a commercial grade septic system on their property.

- *Grantee guarantee.* There is no provision requiring BHLLC to grant a lien on its property in favor of the Eleazers so as to protect the latter's interests in the event that BHLLC become insolvent or does not satisfy a judgment arising from the use of the easement.[6]

Consideration of both the terms included in and omitted from the easement imposed by the trial court reveals the peril of foisting upon contracting parties terms neither bargained for nor agreed to in the contract. Indeed, the potential for harm is magnified in this case due to the noxious, unsanitary nature of raw sewage. Unlike an easement for shared use of a driveway, for example, damage to or mismanagement of the OSS carries with it significant consequences for not only the value of the properties at issue, but also for the public health, which is why the SHD is involved in this dispute. As the owners of a single residential house, it seems entirely conceivable that the Eleazers would—in exchange for granting easement access to the commercial ventures on the adjoining property—insist not only on terms that allow them to use and enjoy their land, but on terms that insulate them from disproportionate exposure to liability or economic loss.

Ultimately, we agree with the Eleazers that the trial court erred. Nevertheless, the Eleazers are not entitled to receive more than they bargained for in the REPSA. Although the court erred by imposing easement terms, it was understandably concerned with holding the Eleazers to their promise contained in the Form 34 addendum. Rather than imposing terms foreign to the REPSA,

---

[6] Our discussion of these terms is intended to be illustrative, not exhaustive.

however, the trial court should have ordered the Eleazers, consistent with the duty of good faith and fair dealing, to make a "good faith" offer of easement terms to Nordstrom.[7]

"There is an implied duty of good faith and fair dealing in every contract," which "obligates the parties to cooperate with one another so that each may obtain the full benefit of performance." Frank Coluccio Constr. Co. v. King County, 136 Wn. App. 751, 764, 150 P.3d 1147 (2007). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (1979). While this duty does not foist substantive terms upon contracting parties, it does obligate the parties to "perform in good faith the obligations imposed by their agreement." Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). Therefore, "the duty arises only in connection with terms agreed to by the parties." Badgett, 116 Wn.2d at 569.

The parties to the REPSA agreed that the Eleazers would grant an OSS easement to Nordstrom, on terms acceptable to both parties. This agreement obligates the Eleazers, pursuant to the implied duty of good faith and fair dealing, to make a "good faith" offer of easement terms to Nordstrom, meaning that the

_____

[7] We recognize that the duty to make a good faith offer of an easement may be different in kind from the trial court's order that the Eleazers offer an easement—subject to approval by the SHD—containing commercially reasonable terms. The Eleazers have a contractual duty of good faith to make an offer to Nordstrom. The Eleazers' good faith is informed by that which is expected of a single family house purchaser, paying the price stated for the land to be conveyed, who is offering to accept commercial quantities of sewage on to the buyers' land. It is also informed with the understanding that if the offer is not accepted, the buyers will walk away from the deal, rather than accept ownership of the real property.

offer that they will have an opportunity and obligation to make on remand must maintain both fidelity to the purpose of their promise and consistency with the justified expectations of Nordstrom. In supervising this directive, the trial court should remain mindful of the asymmetry between the respective uses of the two properties: the Bush House property is being used for two commercial enterprises, whereas the Eleazer property is being used as a single-family residence.

If, on remand, the Eleazers fail to make a "good faith" offer, then Nordstrom may seek either damages from the Eleazers or rescission of the REPSA. If the Eleazers do make a good faith offer, however, then Nordstrom must either accept the offer, entice the Eleazers to accept a counteroffer, seek rescission of the REPSA, or forego a remedy.[8]

In the event that Nordstrom seeks rescission of the REPSA, the following principles of law will be instructive.

> Rescission means to abrogate or annul and requires the court to fashion a remedy to restore the parties to the relative positions they would have occupied if no contract had ever been made. Rescission is an equitable remedy and requires the court to fashion an equitable solution. The circumstances of each particular case must largely determine what is necessary for one party to do in order to place the other in status quo.

Busch v. Nervik, 38 Wn. App. 541, 547-48, 687 P.2d 872 (1984); see also Cornish Coll. of the Arts v. 1000 Va. Ltd. P'ship, 158 Wn. App. 203, 230, 242 P.3d 1 (2010) ("The trial court has broad discretion in fashioning equitable

---

[8] If the Eleazers make a good faith offer (as determined by the trial court) they will not be in breach. Nordstrom, however, may reject even a good faith offer and seek rescission—putting the parties back where they were before closing. This is consistent with the Form 34 agreement.

relief."). In restoring the parties to the relative positions they would have occupied had no contract ever been made, the trial court may consider, among others, factors such as enhanced value from improvements made to the property by the Eleazers, reasonable rental value during the Eleazers' occupancy, any property taxes paid by the Eleazers, and any increase or decrease in the value of the land and house. Busch, 38 Wn. App. at 548. Additionally, any damages calculated by the trial court should run from the date at which the contract required performance, in this case the date of closing. See Cornish Coll., 158 Wn. App. at 229 (holding that damages should run from the date at which the contract required performance where consequential damages were awarded in addition to specific performance).

III

The Eleazers next contend that the provision contained in the Form 34 addendum merged into the statutory warranty deed at the time that Nordstrom conveyed title to the Eleazers. This is so, they assert, because the provision was central to the agreement to convey. We disagree.

"Under the merger doctrine, the provisions of a real estate purchase and sale agreement merge into the deed upon execution of the deed." Ross v. Kirner, 162 Wn.2d 493, 498, 172 P.3d 701 (2007). "This recognizes parties' rights to change the terms of their contract at any time prior to performance." Brown v. Johnson, 109 Wn. App. 56, 59, 34 P.3d 1233 (2001). "However, this rule is not ironclad." Black v. Evergreen Land Developers, Inc., 75 Wn.2d 241, 248, 450 P.2d 470 (1969). Although "[i]t is well established that REPSA

provisions merge into a statutory warranty deed," no merger will occur if the provisions are "'collateral contract requirements that are not contained in or performed by the execution and delivery of the deed, are not inconsistent with the deed, and are independent of the obligation to convey.'" Buck Mountain Owner's Ass'n v. Prestwich, 174 Wn. App. 702, 732, 308 P.3d 644 (2013) (quoting Barber v. Peringer, 75 Wn. App. 248, 251-52, 877 P.2d 223 (1994)). Moreover, there is no presumption of merger where there is no evidence that the parties intended to relinquish the contractual provisions contained in the REPSA and courts will endeavor to divine the intent of the parties in making this determination.

> "In all cases then, where there are stipulations in a preliminary contract for the sale of land, of which the conveyance itself is not a performance, *the true question must be whether the parties have intentionally surrendered those stipulations.* The evidence of that intention may exist in or out of the deed. If plainly expressed in the very terms of the deed, the evidence will be decisive. If not so expressed, the question is open to other evidence, and *I think in absence of all proof, there is no presumption that either party, in giving or accepting a conveyance, intends to give up the benefit of covenants* of which the conveyance is not a performance or satisfaction."

Davis v. Lee, 52 Wash. 330, 335-36, 100 P. 752 (1909) (emphasis added) (quoting Morris v. Whitcher, 20 N.Y. 41 (1859)).

In arguing that an agreement to convey an easement is central, not collateral, to the agreement to convey, the Eleazers rely on a case decided by Division Three of this court. In Barnhart v. Gold Run, Inc., 68 Wn. App. 417, 843, P.2d 545 (1993), a seller promised to convey a dominant estate together with an easement over the adjoining servient estates. Barnhart, 68 Wn. App. at 418-20.

- 20 -

Before the deed was executed, the parties entered into a real estate contract, which included a provision mandating that—in the event that a lawsuit was commenced between the parties—attorney fees were to be awarded to the prevailing party. Barnhart, 68 Wn. App. at 418-20. The deed, however, did not include the attorney fees provision. Barnhart, 68 Wn. App. at 418-20. The deed did expressly grant the easement agreed to in the real estate contract. Barnhart, 68 Wn. App. at 419. After the deed was executed, the seller sought attorney fees in connection with the buyers' action to enforce the agreement to convey the easement. Barnhart, 68 Wn. App. at 424. In affirming the trial court, Division Three concluded that the basis of the buyers' action to enforce the agreement to convey the easement was central, not collateral, to the agreement to convey. Barnhart, 68 Wn. App. at 424. Thus, the seller's contractual right to attorney fees ended when the deed was executed. Barnhart, 68 Wn. App. at 424.

Barnhart is distinguishable from this case. Unlike in Barnhart, where the seller promised to grant an easement to the buyer, the contractual provision at issue here is the *buyers'* promise to grant an easement to the seller. This difference is significant in that it eliminated the need for Nordstrom to reserve to herself an easement in the statutory warranty deed. Furthermore, as it was Nordstrom who executed the deed, the Eleazers could not have used the deed to grant an easement to Nordstrom. In short, because the buyers promised to grant an easement to the seller, the deed is unlikely to yield evidence of the seller's state of mind. Given the absence of evidence outside of the deed suggesting

that Nordstrom intended to relinquish the benefit of the Eleazers' promise to grant to her an easement, we do not presume that such was her intent.

Nevertheless, the Eleazers assert that the deed was inconsistent with the provision contained in the Form 34 addendum. The two are inconsistent, they argue, because the deed warranted that the property was free from the type of easement that the provision "purportedly meant to create." Their argument is meritless. As noted, the provision contained in the Form 34 addendum merely stated that an easement was to be recorded that was agreeable to the parties. The trial court's error in imposing easement terms where no agreement had been reached did not render the provision inconsistent with the deed. Accordingly, the provision contained in the Form 34 addendum does not merge into the deed.

Reversed and remanded.[9, 10]

We concur:

---

[9] The Eleazers' May 22, 2014 motion to strike portions of the brief filed by the respondents is granted.

[10] Given that discretionary review was not granted as to the other issues briefed by the parties, we find no reason to resolve them at this time. Because we reverse and remand, the trial court's rulings that we decline to address remain interlocutory in nature.